Tennessee Board of Education. Argument not to exceed 15 minutes per side. Ms. Good, when you are ready, you can proceed for the appellant. Good morning, Your Honors. My name is Janet Good. May it please the court, I'm here today with my co-counsel Michael Braun representing J.B. and his parents who bring this appeal. I'd like to reserve four minutes for rebuttal. In this case, brought under the Individuals with Disabilities Education Act, or IDEA, the school district entirely shirked its responsibilities. Responsibilities upon which its receipt of federal funding is conditioned. If this court does not hold the district responsible for negligently and without any rational justification, failing to take any steps whatsoever, those conditioned responsibilities are rendered meaningless. Can I ask you a question about the claims in the case? Yes. Is there a claim that your client specifically asked for an I mean, or is that something that was not brought in the state administrative proceeding and therefore was not exhausted? So thank you for raising that. That claim as a stand-alone claim was not brought. What is true is that the parents request, first of all, there was repeated communication from these parents with the school district. I understand that, but was there a claim regarding, did they say, hey, we don't like the 504 route, we would rather that you do an evaluation? There are facts in the record that show that they did ask for an evaluation, but no, there is not a separate claim that is not exhausted. I mean, that can be a separate claim, right? It can, yes. Okay, so the claim here is that the school district, given all of the information, and there was a lot of communication, obviously, given all of that and all of these indicators, I mean, he had been hospitalized, there was all kinds of stuff that went on, that the light bulb should have gone off and they should have said, oh, wait a minute, we need to really evaluate this guy. Correct. Right? I mean, that's basically the claim. Correct, and so the claim is a child fine claim, primarily, and the parents requesting an evaluation is a factor in that child fine claim, but, right, yes. There were all of these other clear signs along the way, some of which you have identified, and as I said, there were two communications, meaningful communications with the parents before school even started in the 2017-2018 school year. By our count, there were at least four clear signs in August during the first month of school, 12 during the second month of school. But I guess my problem is, or the crux of the case for me is, there was a lot going on, there was response from the school district, the 504 plan, for example, right, so they're doing something, I understand it's not a substitute, but once they say, okay, we recognize there are some issues and we're going to do this, including, at the end, reassignment to another school, they are handling it the way that they think they should be handling it. We are supposed to give some deference to that, right? I mean, there's some educational expertise deference that we give, right, from the state administrative findings, so I don't know why, I mean, why would we second guess that, especially given the time frame? We're talking about two months or three months here, not, you know, a course of a year or something, so why is it that we, that wouldn't, in the end, be how it works out? So I think you've raised two really great points, and the first one is whether or not the school district did anything at all, and it's our contention that the school district did not do anything. The 504 plan that you referenced, in fact, was never in effect while in the district, and that didn't actually... Right, but was it going to go into effect? I mean, he was only enrolled in the district for three months or whatever, I guess I'm curious what, I mean, are they supposed to drop everything and say, okay, here, I mean, we're doing this and this and this and whatever, I mean, I don't... So I want to sort of back it up a little bit. So, first of all, the child find mandate is to locate unidentified children suspected of having a disability, and then referring them for a special education evaluation, right? So the record here clearly shows that the district did not do any of the above. They sort of talked about talking about things, but they never actually kind of got there. So that's true that they needed time to do so, but they didn't collect any data whatsoever. I mean, a 504 meeting or an IEP meeting doesn't occur in a vacuum, rather it needs to be informed by data and observation, and the school district certainly had plenty of time to observe and collect data, particularly given the severity of the clear signs in this case. But the student was taken out of the school, what, after three months or so? Yes, yes, your honor. Put in a different school district or put a private school? His parents chose to homeschool him because the only alternative that they were given was the alternative school, MAP Academy. Essentially, he was pushed out of school. Again, those 38 days that he spent, and those are 38 school days, that represents approximately a quarter of the school year, although it may seem at first blush to be certainly a short amount of time, it's not a short amount of time in order to refer somebody for an evaluation. Because the evaluation process does take time, but that's not what's in contention here. What's in contention is that they didn't even refer him for an evaluation. They talked to the parents about collecting data, but they never did so. So that there was a lot of talking about, well, we're going to do this next, but those things never occurred, nor did they after JB withdrew from the district, even though the IDEA is clear that their responsibilities continued even after his withdrawal. Now, didn't the district have a, what they call it, sort of a two-tiered plan that they were going to put into effect, I think, in October, maybe? There have been some back and forth with the teacher, the assistant principal, Ms. Bowman, in September, maybe early October. And then in October, I thought that the record reflects that everybody got together and said, we're going to do an evaluation of some sort. It's going to take a two-week observational period. There's going to be a meeting on October 30th. And then because the parents did not want this child to be possibly sent to this alternative school, they pulled him out. So I just don't know if it's really fair to say the school wasn't doing anything. It sounds like they were sort of progressively trying to work with the parents for a student who just moved from out of state, was getting adjusted. So I guess I just wonder, I guess I don't see complete inaction here by this. Right. So respectfully, they told the parents that they were going to collect data, but they never, in fact, did collect data. And the district's own witness, a BCBA, a board-certified behavior analyst, who testified at the due process hearing, testified that data collection is what all of this rests upon, and that she would recognize data if she saw it, and that there was none collected in JPT. When would that have been collected? Because they pulled him out before the October 30th meeting, if I'm right about that? No, well, they pulled him out as a result of that meeting. So they pulled him out in early November. So the data collection, it's appellant's position that that data collection should have started in August. But, even if you reject that argument, even if you reject that they should have been on notice from the parents' lengthy communications about his mental health history, his troubles in school, the support that he had been receiving in his prior school. So before he even started at school, they should have done it? No, I think that put them on alert that this was a child with a suspected disability. I think that the parents did request help. I don't think that they used magic words the case, but they certainly did ask for help. They asked for the school to partner with them. They asked at one point. I mean, I guess, I don't know with that. Yeah, okay. And so the school takes them at their word and says, okay, we have a meeting, we're doing this stuff, what Judge Cole said, we're going to have a plan. I mean, I don't, I mean, that seems like consistent with what the parents were saying if they're not making a specific request. Well, I think that there is evidence that they did request an evaluation. And there is also evidence that the school district didn't do any of the steps that they said that they were going to take. They didn't come up with a behavior plan. They didn't collect any data. None of those things occurred. At the hearing, at the due process, or at the, whatever, the state hearing, what were the witnesses that the parents presented? Did they have an expert? The parents did have an expert, Dr. Ebony Webb. And then they had several other witnesses as well, but those, she was their expert witness. I mean, it was, it seemed like the school district presented several witnesses. I mean, obviously, employees, but quasi-experts, I suppose, on how they approach these kinds of cases. Yes. The rebuttal case didn't seem to be as strong to me, but maybe I'm misreading the record. Right, and in fact, their own BCBA, as I had mentioned, said that the record, that his school records were devoid of any evidence of interventions or data collection. Thank you. Good morning, Your Honors. I'm Ken Williams from the Tennessee Bar, and I'm here to no disrespect men, I forgot my dress shirt, so I don't mean any disrespect to the court the way I'm dressed today. Your Honor, you made a very good point that, right or wrong, they did not exhaust their administrative remedies when asking for an evaluation. That should have been pled. It wasn't pled. That was pointed out by the ALJ, by the magistrate, and by the court. In this situation, we have a child who has no history of special education. His parents every year, when he was in Indiana, would give a letter, a guidance letter, to teachers. They testified those were not intended for 504 or IDEA. They were just to explain their child. When they moved to the Wilson County School System, they gave the same letter. They said the same thing. It was not intended for a 504 or an IDEA. Clearly it wasn't a quote unquote normal situation, right? The child had had some issues. They alerted the school that, hey, we want to come in. We want to see the school. We're concerned a little bit about the adjustment. Then it just starts to get rolling from there. At some point, aren't you on notice, especially after the Vanderbilt thing? Why are you not at that point, hey, we need to evaluate this kid? That's what I don't get, why you didn't kind of do any of that with those kind of red flags. Yes, sir. First of all, it's very clear, the parents said so, the child said so, the experts said so. The environmental factor of this move from Indiana to Tennessee played a big role in what was going on with this child. And so response to intervention, it's called RTI, is dealt to deal with things that may be environmental stressors in a child's life. If that doesn't work, then you can move into the IDEA and look for special education. But this child was not behind education. He was at grade level. He was having problems, but most of his problems were frankly in the home. And the IDEA is dealt to deal with children in the school system. So if you're having problems with a child at home and they're not in the school system, that is not what you're designed to address. Your purpose is to give free and appropriate education to children. But how do you figure that out without, like how do you isolate what the issue is without kind of doing some more detailed evaluation? I mean, I understand that point, but I mean, your friend on the other side says, look, you need the data, right? You need to figure out what's going on. Is it in fact just the move? I mean, does that explain 90% of what's happening or is there something else going on? I mean, how do you know without doing the investigation? Well, and that's a good point, your honor. The response to intervention is designed to deal with that fact. In this case, we have a child whose parents would come to the school with what they call partnering, not asking for a 504, not asking for IDEA. The child would get better, the child would get worse, the child would have behaviors at home, ultimately that resulted in his hospitalization at Vanderbilt. When the child came back, school was starting fall break. So plans were set up to observe this child in the classroom setting. That's what the teachers do who are part of these IEP teams. And they do their observational data. That doesn't mean they're doing testing, but they're watching the child in his normal environment. And within, you take two weeks off for fall break, the child comes back and it spirals into this situation where the SRO officer arrested the child. That's a serious situation. You've also got a Vanderbilt physician who's indicated that the child needs a 504, not an IDEA. Again, this child is not having problems with his education. When you look at the... What did that report say from Vanderbilt? It recommended that he be evaluated for a 504, Your Honor. Is your position that you evaluated this young man, or that they didn't want you to evaluate him? Your Honor, I think after the child went to Vanderbilt that they wanted an evaluation. And we looked at all the factors. But this child, if you look at the Vanderbilt report and you look at all the problems this child's having, he fell within the definition, I guess, of an emotional disturbance. And under 34 CFR 300.8.C.4, emotional disturbances require a long period of time, and to a marketed degree, of adverse effect on an educational performance. So you can't just say in three weeks, this child has an emotional disability and is in need of special education. You have to observe, you try the response to intervention, different doesn't work, ultimately, then you give the child special education, which is what happened after two years in this case. What was the time, I'm sorry, remind me, what was the time frame between the coming back from Vanderbilt and them pulling the child out of school? The child came back from Vanderbilt the last week of September, and I believe they pulled the child out either the last week of October or the first week of November. So there was two weeks of fall break, then there was the arrest, and then the child was out, and then they finished with the... And then the arrest was in the interim? Yes, sir. The arrest was in the interim. And the child obviously was dysregulated and was not controlling his emotions. The question is, do we jump to the conclusion... Are there, and forgive me if it's in the record and I don't remember, but are there written guidelines or policies in the school district about how to deal with, do a 504 first, when you collect data, how you comply with this stuff, or is there state guidelines? There are state guidelines. As with any guidelines, they're flexible and sometimes vague, but in this case, all the expert testimony was to the effect that you can't pigeonhole this child as a special ed child right away. You need time to try these interventions and see what works and see if time heals the move from Indiana to Tennessee. When you say expert testimony, did you have any experts at the hearing that were not kind of employees of the school already? Yes, sir. We did. We had two or three. Clovis Stair was one of them, and she was out of the Knox County school system, and I can't remember the lady's name from the Murfreesboro Rutherford County school system testified as a BSBA or something to that effect. What did those experts look at to prepare for their testimony? Did they talk to the child or the parents, or did they... They looked through the child's records. They did not interview the child, but they did look through the child's records, look through the child's history, and as Ms. Stair says, Your Honor, and I think it's set out in our brief, but when you're dealing with a situation where there's an external environmental factor, you have to eliminate that factor or you may misdiagnose the child as special needs or special education. In this case, that factor was obvious. The parents admitted it. The child admitted it. He was having problems regulating his behavior because of his move from Indiana to Tennessee. So if you can deal with that environmental issue, you may not have to go into the special ed realm. So the district did conclude, I guess it was after the administrative complaint process or during it, that the child did need special education. After I think it was, I believe it was about two years afterwards they filed their due process complaint, and the school went through a full evaluation process at that time and found the child was eligible for special education. Okay. And I mean, is there any reason why the school, the district would not have started that sooner? I mean, they would have had most of that information, wouldn't they? Well, again, you have to give the response to intervention time to work. So the environmental stressor was clearly identified. It was this move. The question is, how do we regulate that? Do we give the child more time to study? Do we give him therapy sessions? What do we do to help incorporate him into the school system without taking the extraordinary step of defining him as a child in need of special education? And so the school system did that. Once they filed the complaint, it triggered that process. Your Honor, that's all I have. If y'all have any questions, I'm glad to answer. Thank you. To be clear, we are talking about a referral for an evaluation, not a finding that J.B. in fact qualified for special education, which in fact, as you know, he did two years later. This dispute, this child find dispute, is about a referral for an evaluation. And those steps, for folks who haven't been through them, they are lengthy. They include gathering the relevant people into a meeting in a room, signing a consent form on which there's a discussion about which evaluations that the school district should undertake, and then a process of data collection. What opposing counsel said, which I will take issue with for a minute, is that you have to give RTI time to work. Response to intervention is a method of gathering data about children in order to see if the interventions that are being used are working or not working. But counsel is wrong on two points. First, RTI was never undertaken with J.B. There was no data collection. There was no RTI. There was talk about RTI, but the school district failed to implement RTI. And in fact, had they implemented RTI, that would have been very helpful because it would have provided exactly the kind of data that is needed to determine whether or not J.B. in fact qualified for an IEP and for special education. Did the parents ask for that? No, they did not specifically ask for RTI. And in my experience, parents don't actually, that's not within their wheelhouse. Is that technical for them to ask for? I think a lot of parents don't know what RTI is. I think a lot of people don't know what RTI is. That is in the province of educational expertise that the school is in the best position to say, hey, this is a kid who is struggling. And with respect to J.B.'s grades, he was struggling. He had an incomplete in math. There are two basic courses that we all need to succeed in life. One is reading, language arts, whatever you want to call it, the ability to read, and math. And he had an incomplete in math. What the record doesn't speak to is that the only A that he did have was in PE. This is not a kid who was doing great in school. He was having a lot of trouble. And his problems were not just in the home. His multiple suspensions speak to that. And his arrest. It's very difficult to say, well, this is typical behavior. Oh, except for that arrest. An arrest is not typical behavior for an eighth grade boy. What about this two-week observation period? Is that part of the data collection process? The one that was scheduled for, I think, October. There was an October 30 meeting. Right. It would have been had they collected data, but they didn't. The record is completely devoid of any evidence that they collected a single piece of data. So they did not. Was it more difficult to collect data because he withdrew from the school or not? Well, obviously they can't collect data on him after he withdraws in November. But JB sat in school, by my count, on a six and a half hour school day for 247 hours. That's 247 hours that he is sitting in a classroom that the district has control of where they could observe him. And they entirely failed to do so. You're not complaining about the fact there was no evaluation. You're just saying that the evaluation was inferior and wasn't appropriate. No. The crux of the claim is that he should have been a child who was a child with a suspected disability who should have been referred for an evaluation. And again, there's this time period from August to November of 2017. There's also a time period from November 2017 to August of 2019 when the school district, in fact, does evaluate him and finds that he has an emotional disturbance and qualifies for special education. Your argument is he should have been referred maybe as early as mid-August. Yes. Because he had the first disciplinary incident maybe August 16. Correct. Yes. But from there, even if you were to reject that, I do believe he should have been referred at that point. But even if you don't agree with that, there were other points, including a stay at Vanderbilt Psychiatric Hospital in September. Great. Thank you. Thank you to the parties. We are briefing an argument and the case will be submitted.